United States Court of Appeals,

Fifth Circuit.

No. 93-4847.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DREDGE OPERATORS, INC., Respondent.

April 21, 1994.

Application for Enforcement of an Order of the National Labor Relations Board.

Before HIGGINBOTHAM and WIENER, Circuit Judges, and KAUFMAN[*], District Judge.

FRANK A. KAUFMAN, District Judge:

Respondent-appellant Dredge Operators, Inc. ("DOI") is a Louisiana corporation which operates an ocean-going, United States flag vessel known as the dredge *Stuyvesant.* On April 8, 1991, the National Maritime Union ("NMU" or "Union") filed a representation petition with the National Labor Relations Board ("NLRB"), seeking to represent a bargaining unit composed of the unlicensed members of the crew of the *Stuyvesant,* which was based at that time in Galveston, Texas.[1] In mid-April the vessel sailed to San Francisco, from which it departed on April 27, 1991, for Hong Kong where it arrived on May 23, 1991. Since that time, the *Stuyvesant* has been engaged in dredging work for the new Hong Kong international airport pursuant to a contract with the government of Hong Kong.

_____

[*]District Judge of the District of Maryland, sitting by designation.

[1]The Stuyvesant employs about 20 to 22 unlicensed seamen who work in rotating crews of 10 to 12.

On April 30, 1991, the representation hearing was held with regard to the aforementioned April 8, 1991, petition.  Following the hearing, the Regional Director ordered, on May 28, 1991, that an election be held by mail ballot.  DOI's request for review of the direction of election was denied on July 29, 1991.  After the August 7, 1991 election, the Board certified the NMU as the statutory collective bargaining representative of the unlicensed seamen employed aboard the *Stuyvesant* on April 14, 1992.[2]  On April 28, 1992, the union requested collective bargaining negotiations with DOI which request DOI subsequently refused in a letter dated May 18, 1992.  In that letter, DOI stated that the NLRB lacked jurisdiction over the *Stuyvesant* and that Hong Kong labor laws requiring the hiring of a certain percentage of Hong Kong employees conflicted with United States labor laws mandating that a United States flag vessel employ only Americans.

Currently, the *Stuyvesant* employs 12 Hong Kong crewmembers and 14 American crewmembers.  DOI had obtained work permits from the Hong Kong government in July 1991 and April 1992 to employ American crew members.  The work permits were conditioned upon DOI's agreement to retain the 12 Hong Kong crew members and to lay off American workers before Hong Kong workers in the event of a reduction in force.  In a letter dated November 5, 1991, the Coast Guard notified DOI that the requirement of U.S. Shipping Act, 46

---

[2]Prior to the certification, DOI challenged the election results.  The Board held a hearing concerning the election results on October 8, 1991, and shortly thereafter issued a report with regard to the challenged ballots rejecting DOI's contentions.  On March 30, 1992, the Board adopted the report's findings and recommendations.  The controversy with regard to the election results are not relevant to the instant appeal.

U.S.C. § 8103(b)(1)(A), that a United States flag-vessel carry a full American crew would be suspended for the time being. The Coast Guard subsequently wrote to the Department of State explaining that DOI had hired Hong Kong workers with Coast Guard permission. According to DOI, the Department of State has not responded to that letter.

Following DOI's refusal to negotiate with the union, NMU filed a refusal to bargain charge against DOI on June 8, 1992. The NLRB then issued, on July 10, 1992, a "Complaint and Notice of Hearing" charging DOI with violations of sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1), ("NLRA" or "the Act"),[3] by refusing to bargain with the union. Apparently, the NLRB set no hearing date, nor did it give an actual notice of any hearing date with regard to the July 10, 1992, complaint.

General Counsel for the NLRB filed a motion for summary judgment on November 9, 1992, to which DOI responded on December 3, 1992, along with a cross-motion for summary judgment. In the meantime, on November 12, 1992, the Board had transferred the proceeding from the Regional Director to the NLRB in Washington D.C. for resolution. On December 16, 1992, the Board granted the Board's motion for summary judgment and ordered DOI to cease and desist and to bargain with the Union. 309 NLRB No. 159 (December

---

[3]Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their statutory rights. 29 U.S.C. §§ 158(a)(5) and (1).

16, 1992).  The Board determined that DOI had adduced no additional evidence requiring a reexamination of the prior April 30, 1991, representation hearing and that accordingly, DOI's refusal to bargain with the Union violated the NLRA.  The Board also rejected as lacking merit DOI's contention that the July 19, 1992, complaint must be dismissed because it did not include a notice of hearing. In response to DOI's contention that it was no longer engaged in commerce, the Board found that DOI is an employer engaged in commerce within the meaning of the Act, noting that DOI received over $1 million at its Louisiana headquarters from the government of Hong Kong.  The NLRB brings an application for enforcement of the NLRB's order, which DOI opposes.[4]

We uphold the Board's findings of fact if they are supported by substantial evidence.  *NLRB v. Houston Bldg. Serv. Inc.,* 936 F.2d 178, 180 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 1159, 117 L.Ed.2d 407 (1992) (citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).  The Board's interpretation of the statutes it is charged with administering is upheld if reasonable and "is entitled to considerable deference."  *NLRB v. City Disposal Systems, Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984) (citing *NLRB v. Iron Workers,* 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978)).  For the reasons stated herein, we enter judgment enforcing the Board's order.

## I.

DOI first asserts that the NLRB lacks jurisdiction over this

---

[4]The NMU is an intervenor in this appeal.

case because the *Stuyvesant* operates in Hong Kong territorial waters under contract with the Hong Kong government and has no present intention of returning to the United States.  In addition, DOI contends that it is not engaged in "commerce" within the meaning of section 2(6) of the NLRA, 29 U.S.C. § 152(6).[5]

The Supreme Court "has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause."  *NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963).  DOI concedes that the NLRB is not constitutionally barred from exercising jurisdiction over the *Stuyvesant,* but argues that comity concerns should prevent such an exercise of jurisdiction.

DOI relies almost exclusively on a series of Supreme Court cases concerning labor disputes aboard foreign flag vessels.  In *Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), the Supreme Court declined to apply the NLRA

---

[5]The terms "commerce" and "affecting commerce" are defined in §§ 2(6) and (7), 29 U.S.C. §§ 152(6) and (7) as follows:

> (6) The term "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

> (7) The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.

to an American union which was picketing on behalf of foreign crewmembers of a foreign flag vessel owned by a foreign corporation which was temporarily in an American port. The crew was made up entirely of nationals of countries other than the United States, and wages and hours of employment were governed by a British agreement. The Court noted that "a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country," but that "[t]he exercise of that jurisdiction is not mandatory." *Id.* at 142, 77 S.Ct. at 702. The question therefore which arose in *Benz* was "one of intent of the Congress as to the coverage of the Act." *Id.* The Court concluded that "Congress did not fashion [the NLRA] to resolve labor disputes between nationals of other countries operating ships under foreign law." *Id.* at 143, 77 S.Ct. at 702.

In *Windward Shipping (London), Ltd. v. American Radio Ass'n,* 415 U.S. 104, 111, 94 S.Ct. 959, 963, 39 L.Ed.2d 195 (1974), the Supreme Court noted that "[i]n the 17 years since *Benz* was decided ... this Court has continued to construe the [NLRA] in accordance with the dictates of that case." Writing in *Windward,* the Supreme Court recalled the decision in *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), where "we held that the National Labor Relations Board had improperly assumed jurisdiction under the Act to order an election involving foreign crews of foreign-flag ships." 415 U.S. at 111, 94 S.Ct. at 963. Continuing in *Windward,* the Court also noted *Incres S.S. Co. v. International Maritime Workers Union,* 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963), in which "we applied [the

*Benz* and *McCulloch*] rationale to a situation involving union picketing of a foreign ship in an effort to organize the foreign crew, [and] "concluded that maritime operations of foreign-flag ships employing alien seamen are not in "commerce' within the meaning of [the Act].' " 415 U.S. at 111, 94 S.Ct. at 964 (quoting *Incres,* 372 U.S. at 27, 83 S.Ct. at 613).

Nevertheless, in *Windward,* the Supreme Court further pointed out that *Benz* and its successor cases had not "exempt[ed] all organizational activities from the Act's protections merely because those activities in some way were directed at an employer who was the owner of a foreign-flag vessel docked in an American port." *Id.* at 112, 94 S.Ct. at 964. In support of that proposition, the Court cited to *International Longshoremen's Ass'n v. Ariadne Shipping Co.,* 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970), in which the Court "held that the picketing of foreign ships to protest substandard wages paid by their owners to nonunion American longshoremen was "in "commerce' within the meaning of § 2(6).' " 415 U.S. at 112, 94 S.Ct. at 964 (quoting *Ariadne,* 397 U.S. at 200, 90 S.Ct. at 874). In the light of prior case law, the Court in *Windward* explained:

> "The term "in commerce,' as used in the [NLRA], is obviously not self-defining, and certainly the activities in *Benz, McCulloch,* and *Incres,* held not covered by the Act, were literally just as much "in commerce' as were the activities held covered in *Ariadne.* Those cases which deny jurisdiction to the NLRB recognize that Congress, when it used the words "in commerce' in the [NLRA], simply did not intend that Act to erase longstanding principles of comity and accommodation in international maritime trade."

415 U.S. at 112-13, 94 S.Ct. at 964.

In *Benz, McCulloch, Incres, Ariadne,* and *Windward,* the Supreme

Court stressed the need to follow the intentions of Congress in connection with the foreign policy needs of the United States and in *McCulloch,* specifically called attention "to the well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship." 372 U.S. at 21, 83 S.Ct. at 677.

In contrast to *Benz,* this case involves an American carrier. "The longstanding tradition of restraint in applying the laws of this country to ships of a foreign country—a tradition that lies at the heart of *Benz* and every subsequent decision—therefore is irrelevant to this case." *International Longshoremen's Ass'n v. Allied Int'l, Inc.,* 456 U.S. 212, 221, 102 S.Ct. 1656, 1662, 72 L.Ed.2d 21 (1982) (NLRB has jurisdiction over boycott by American union which refused to unload cargoes shipped from the Soviet Union on American carriers where the boycott "in no way affected the maritime operations of foreign ships.")

We agree with the Eleventh Circuit's observation that:

> "In *Benz* and the subsequent cases ... the Court did not restrict the scope of the NLRA to conduct which occurs within the geographic boundaries of the United States. To the contrary, each of these cases dealt either with employment relations upon a foreign vessel docked at an *American* port or the picketing activity of a domestic labor union *in the United States.* In each case, despite the fact that the conduct at issue was well within the geographic reach of American law, the Court held that the NLRA was not intended to apply. The *Benz* cases do not represent generally applicable boundaries of commerce but instead a judgment that Congress did not intend to interfere with the internal operation of foreign vessels."

*Dowd v. International Longshoremen's Assn.,* 975 F.2d 779, 788 (11th Cir.1992) (applying the NLRA to an American union which solicited a foreign union to pressure foreign importers with the intent and effect of causing a secondary boycott in the United States).

DOI points to no cases holding that the NLRB lacks jurisdiction over a labor dispute aboard an *American* —as opposed to a foreign—flag vessel, in a case such as this one. DOI does cite to *Cruz v. Chesapeake Shipping, Inc.,* 932 F.2d 218 (3rd Cir.1991), to support its proposition that American-flagged vessels are not "floating piece[s] of American territory." *Id.* at 227. However, *Cruz* involved the unique circumstance of eleven vessels, owned or managed by American or Kuwaiti corporations, flying an American "flag of convenience." *Id.* In *Cruz,* Philippine seamen employed on ships in the Persian Gulf attempted to invoke the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.,* to their employment aboard Kuwaiti oil tankers temporarily flying the United States flag "to gain the protection of the United States" against shipping hazards during the Iran-Iraq war. *Id.* at 220. Judge Rosenn, in an opinion in which he spoke only for himself, in which Judge Cowen concurred in the judgment only, and with regard to which Judge Alito dissented, held "that the plaintiffs were not engaged in commerce nor employed by an enterprise engaged in commerce under the terms of FLSA," and that "[w]e affirm the judgment of the district court [in favor of defendants] because Judge Cowen believes that under choice of law principles United States law did not apply to the plaintiffs." *Id.* In so doing, Judge Rosenn wrote:

> "[F]oreign seamen employed on vessels engaged in foreign operations entirely outside of the United States, its waters and territories do not become subject to FLSA when their vessels are transitorily reflagged under the United States flag and transferred to a corporation chartered under the laws of an American state and immediately leased back to the foreign operating company...."

*Id.* at 232. The American flag flying onboard the ship at issue in

the *Cruz* case was meant "to give notice that these vessels were entitled to the military protection of the United States. Such symbolism is not a valid substitute for involvement in the American economy within the meaning of FLSA." *Id.* at 231. In contrast, the *Stuyvesant* flies the American flag on a permanent basis, thus invoking the laws of the United States.[6] There is no allegation whatsoever in this case that the *Stuyvesant* is not an American flag ship or that it is flying the American flag solely as a matter of convenience. As Judge Alito noted, "Vessels flying the American flag have long been regarded "as part of the territory of [the] nation.' " *Id.* at 238 (Alito, J., dissenting) (quoting *Patterson v. Eudora,* 190 U.S. 169, 176, 23 S.Ct. 821, 823, 47 L.Ed. 1002 (1903)). *See also McCulloch,* 372 U.S. at 21, 83 S.Ct. at 677 (quoted *supra* ); *Lauritzen v. Larsen,* 345 U.S. 571, 584, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953) ("Nationality is evidenced to the world by the ship's papers and its flag."); Restatement (Third) of the Foreign Relations Law of the United States § 501 (1987) ("A ship has the nationality of the state that registered it and authorized it to fly the state's flag....").

In a case similar to the one at hand, the NLRB asserted jurisdiction over a United States flag vessel, owned by an American corporation and working under a contract with the national oil company of Brazil. *Alcoa Marine Corp.,* 240 N.L.R.B. 1265 (1979). The vessel operated offshore of Brazil with no intention of

---

[6]As for its participation in the American economy, in return for its services, DOI has received over $1 million from the government of Hong Kong, thereby engaging in commerce "between any foreign country and any State." 29 U.S.C. § 152(6).

returning to the United States.  In exercising jurisdiction over the vessel, the Board stated that the vessel is "a U.S. flagship; thus she is, for legal purposes, United States territory to which the laws of the United States, including Coast Guard regulations and our labor laws, apply."  *Id.* at 1265.  *Alcoa* has not been overturned,[7] and does not contradict any existing Supreme Court or other federal precedent.  Indeed, its language and approach are entirely consistent with the Supreme Court opinions discussed *supra* in this opinion.

DOI also attempts to invoke a series of cases in which courts have refused to apply various federal laws extraterritorially.  *See, e.g., EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (Title VII does not apply extraterritorially to an employment relationship of an American citizen with an American corporation in Saudi Arabia because Congress did not exercise its authority to cover the same);

---

[7]In *Offshore Express Inc.,* 265 N.L.R.B. 378 (1983), the Board declined to exercise its discretion under the LMRA to assert jurisdiction over an American flag vessel operating at Diego Garcia, a remote island in the Indian Ocean.  Citing the remoteness of the ship's location and the lack of international trade involved (the ship was engaged in services for the U.S. Navy), the Board decided "it would not effectuate the policies of the Act to assert jurisdiction."  *Id.* at 380.  The Board, however, clearly distinguished *Alcoa,*

> The issue in that case [*Alcoa* ] was whether the Board had statutory jurisdiction, whereas here the issue is whether the existence of certain factors warrants the exercise of our discretionary authority to refuse to assert jurisdiction, assuming, *arguendo* that such jurisdiction exists.  In *Alcoa Marine* the Board was concerned with an area of the world which differed markedly in numerous respects, including population and accessibility....

*Id.* at 380 n. 12.

*Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (Congress did not intend the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1604 *et seq.,* to apply extraterritorially). There is a canon of construction that " "legislation of Congress, unless contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *Argentine,* 488 U.S. at 440-41, 109 S.Ct. at 691 (quoting *Foley Brothers v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). However, since a United States flag vessel is considered American territory, *see* Restatement (Third) of the Foreign Relations Law of the United States § 501, application of the NLRA to the *Stuyvesant* would not be extraterritorial. Rather, application of the NLRA to the *Stuyvesant* would comport with the "whole background of the Act [which] is concerned with industrial strife between American employers and employees." *Benz,* 353 U.S. at 143-44, 77 S.Ct. at 702. Thus, the cases cited by DOI regarding extraterritorial application of American laws are not applicable to the instant case. We note in support of the NLRB's exercise of jurisdiction over the *Stuyvesant* that a majority of seamen aboard this American-flag vessel are American; we express no views concerning whether the existence of or the exercise of jurisdiction over the *Stuyvesant* would be proper if this were not the case.

DOI also argues that even if the NLRB has jurisdiction in this case, nevertheless, in the light of the conflict between Hong Kong law and United States law over whether DOI must hire American or Hong Kong workers, any bargaining should be deferred pending the

outcome of a diplomatic effort, or alternatively should be resolved by a Board hearing before the Board finally decides to exercise its jurisdiction. However, at this time, there does not appear to be a conflict which affects DOI's ability to negotiate with the Union. Officials in both Hong Kong and the United States have permitted DOI to employ workers of the other nationality respectively. Neither nation has demanded that DOI fully comply with their respective hiring regulations nor has the Hong Kong government required that DOI recognize another union. Although DOI posits a scenario wherein NMU will refuse to represent the foreign workers, such a scenario is speculative. Accordingly, such argument is not ripe for review. *See, e.g., O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). DOI has voluntarily chosen to engage in foreign commerce and thus, at this time, it must bear the obligations which such a choice entails—obligations which include complying with orders of the NLRB flowing from the latter's exercise of its jurisdiction.

## II.

DOI contends that since the initial representation hearing on April 30, 1991, new facts have arisen which the Board has refused to consider. DOI contends that these facts raise genuine issues of material dispute, making summary judgment improper. Specifically, DOI asserts that the Board has ignored the following important factors: (1) the *Stuyvesant* is in Hong Kong indefinitely; and (2) the Hong Kong government is requiring DOI to employ Hong Kong citizens and to prefer them over Americans in the event of a layoff.

In its summary judgment opinion, the Board addressed DOI's argument that another hearing was warranted, stating:

> All representation issues raised by the Respondent were or could have been litigated in the prior representation proceeding. The respondent does not offer to adduce at a hearing any newly discovered and previously unavailable evidence, nor does it allege any special circumstances that would require the Board to reexamine the decision made in the representation proceeding.

A review of the record confirms that both the Regional Director in his direction of election following the representation hearing and the Board in its summary judgment opinion considered the factors which DOI now urges warrant a new hearing. In the decision by the Regional Director ordering an election, the Director took into account testimony that "upon completion of the Hong Kong contract the *Stuyvesant* may be in foreign waters indefinitely because of the bleak economic outlook for its services in United States waters." Thus, the indefinite duration of the *Stuyvesant*'s presence in Hong Kong was specifically considered by the NLRB in April and May of 1991, and therefore that factor does not alter the conclusion, discussed above, that DOI must negotiate with the Union.

Regarding the conflict between Hong Kong and United States law, the Board stated in its decision:

> The only new circumstances cited by the Respondent are that the Hong Kong government has recently required it to employ a total of 12 Hong Kong citizens in the bargaining unit.... The possibility of such circumstance[ ] occurring was fully considered by the Regional Director in his Decision and Direction of Election and by the Board on Respondent's exceptions thereto.

In his decision, the Regional Director recognized the "Hong Kong rules, regulations, or contractual requirements that ... foreign nationals must secure work permits ... and that whenever possible

jobs will be filled locally."  At the time of the Regional Director's decision, the Coast Guard was demanding that the entire crew of the *Stuyvesant* be American;  but, that requirement has since been relaxed.  Thus, to the degree there has been a change in the facts of this case, that change only bolsters the Board's decision to order DOI to bargain with the Union.

Regarding DOI's contention that summary judgment is not appropriate because it is not clear whether the Hong Kong seamen will have union representation, this scenario is not before us and is therefore not ripe for review.  As the Board explained:  "[T]he Respondent acknowledges [that] it has not to date been required to recognize and bargain with any other union as representative of the 12 Hong Kong crewmembers, and 14 of its American crewmembers are still employed on the vessel."  Although such disputes may arise in the future, the Board appropriately declined to address issues concerning them at this stage of the proceedings.

## III.

DOI contends that the NLRB violated Section 10(b) of the Act, 29 U.S.C. § 160(b), because the complaint did not include a notice of hearing as required by that section.  Indeed, no hearing was either noted or held.  29 U.S.C. § 160(b) states in pertinent part:

> "Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board ... shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof ... at a place therein fixed...."[8]

---

[8]The regulations thereunder, 29 C.F.R. § 102.15, provide in pertinent part:

After a charge has been filed, if it appears to the

Relying on *Lighthouse for the Blind of Houston,* 248 NLRB 1366 (1980), *on reh'g,* 696 F.2d 399 (5th Cir.1983), the Board rejected the DOI's lack-of-notice-of-hearing argument as lacking in merit. In *Lighthouse,* the Board stated that "lack of formal notice of hearing ... without more" did not prejudice Respondent in a situation in which the latter "was served with a copy of the complaint, and thus had notice of the charges ... and an opportunity to prepare its answer and defense." *Id.* at 1367-68.

The Board's decision in *Lighthouse* comports with the law of this and other circuits, all of which excuse technical errors where no prejudice results. *See Hospital & Service Employees Union, Local 399, etc. v. NLRB,* 798 F.2d 1245, 1248-49 (9th Cir.1986) (no prejudice resulted from faulty service of charges where employer was aware of the charges and the purposes of 10(b) were satisfied); *General Motors Corp. v. NLRB,* 222 F.2d 349 (5th Cir.1955) (service is sufficient if it is "made in time and manner to afford adverse parties a fair hearing"); *NLRB v. Royal Palm Ice Co.,* 193 F.2d 569, 570 (5th Cir.1952) (although the complaint and notice of hearing may not have been signed correctly, the respondent was sufficiently apprised of the official issuance of both documents); *Olin Industries, Inc. v. NLRB,* 192 F.2d 799, 799 (5th Cir.1951) (technical defect in service of the charge did not result in

regional director that formal proceedings in respect thereto should be instituted, he shall issue and cause to be served on all other parties a formal complaint in the name of the Board stating the unfair labor practices and containing a notice of hearing before an administrative law judge at a place therein fixed and at a time not less than 14 days after the service of the complaint.

prejudice and any error was harmless).

In the within case, DOI was prepared for and participated in the representation hearing. The majority of DOI's arguments presented in this appeal were then made to the Board and considered by the Board at earlier stages of these proceedings prior to the Board's grant of summary judgment. DOI has pointed to no prejudice resulting from the lack of a formal notice of hearing, or from the fact that no hearing was held; nor has any prejudice been found.

The NLRB regulations authorize summary judgment when appropriate. 29 C.F.R. §§ 102.24, 102.25. It would not appear that the Board is required to hold a hearing before granting summary judgment. But even if such a hearing were required, no harm occurred in this case because the grant of summary judgment in favor of the Board was appropriate for the reasons explained in this opinion. Accordingly, it appears that if the Board committed any error, either by failing to issue a notice of hearing or by failing to hold a hearing, said error was harmless.

IV.

In the light of the foregoing discussion, we enter judgment ENFORCING the order of the NLRB in *Dredge Operators, Inc.,* No. 15-CA-11843.